John C. MARSTON, etc., Plaintiff,
Appellee,

v.

AMERICAN EMPLOYERS INSURANCE
CO., Defendant, Appellant.

Rita J. WALLACE, Administratrix, et al.,
Plaintiffs, Appellees,

v.

AMERICAN EMPLOYERS INSURANCE
CO., Defendant, Appellant.

Nos. 7617, 7618.

United States Court of Appeals,
First Circuit.

March 22, 1971.

Douglas B. Bowring, New York City, with whom Vicente M. Ydrach and Hartzell, Fernandez, Novas & Ydrach, Hato Rey, P. R., were on brief, for appellants.

Harvey B. Nachman, San Juan, P. R., with whom Gonzalez & Rodriguez and Nachman, Feldstein, Gelpi, Antonetti & Smith, San Juan, P. R., were on brief, for appellees.

Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

On October 28, 1967 an airplane crashed on the Island of Culebra. The plane was owned by Charles Pennock but operated by Inter-Island Airways, Inc. under a special leasing arrangement. Pennock would pilot the plane whenever he chose, but for the remainder of the time the plane was leased to Inter-Island which used it in its air taxi service and provided maintenance, inspection, and

storage. Inter-Island had originally owned the plane and before selling the plane to Pennock, it carried an insurance policy to cover its liability for negligent operation. At the time of the sale, Pennock's plane was removed from Inter-Island's policy and was insured under a separate policy issued by American Employers Insurance Company, the appellant, to Pennock.

When the plane crashed in 1967, there were on board three passengers for hire. One, John C. Marston, survived the crash; the other two, George M. Wallace and Hans Nagler, were killed. This diversity action was brought in the District of Puerto Rico by the appellees Marston and the wives of Wallace and Nagler as administratrices of the respective estates. Included among the original defendants were Pennock, Inter-Island, and American Employers Insurance Company.[1] Pennock and American instituted motions for summary judgment. Pennock successfully demonstrated that he was not liable for the crash, and the court granted his motion. American claimed that it had no obligation to defend anyone but Pennock, the named insured on the policy, but the court declined to grant American's motion for summary judgment. It found that Inter-Island's negligence was also covered by Pennock's policy with American. In the same opinion, the district court granted the plaintiffs' motion for summary judgment against Inter-Island on the issue of liability, ruling that the crash was caused by the negligence of Inter-Island's pilot.

The case was tried to a jury on the issue of damages. At the close of plaintiffs' case, Wallace's administratrix sought to amend the complaint to conform with the evidence. Missing from the complaint were any allegations concerning damages to two of the decedent Wallace's children by an earlier marriage even though evidence as to those damages had been given. American opposed the motion and cross-moved to dismiss the complaint of the Wallace and Nagler estates. American claimed that Mrs. Wallace and Mrs. Nagler had brought suit only in their representative capacities as administratrices and that under Puerto Rican law, the heirs of an estate must sue as individuals. The court granted the Wallace motion but denied American's.

After the jury determined damages, plaintiffs moved for attorneys' fees under 32 L.P.R.A. § 1461(6) and P.R.R. Civ.P. 44.4(e), which permit a court to impose fees when a party has been obstinate. The district court awarded such fees.

On appeal, American claims that the court erred in not granting its motion for summary judgment, in not dismissing the complaints of the Wallace and Nagler administratrices, and in awarding fees for obstinacy. In addition to opposing these claims, plaintiffs seek attorneys' fees plus costs for this appeal, claiming that American's claims are frivolous.

## I. AMERICAN'S OBLIGATIONS UNDER THE INSURANCE CONTRACT.

The insurance contract between Pennock and American consists of three pages. The first page is entitled "Declarations", and provides the only spaces for specific entries reflecting the particular transaction. The other pages are solely devoted to standard provisions, all in fine print with no blanks for alterations or additions. The "Declarations" page requires the parties to fill in the identification, in singular, of the insured and his business, the policy period, the monetary limits of liability and the amount of premiums, a description of the aircraft covered, a specification of the purposes for which the plane will be used, and a designation of the pilots authorized to operate the plane. In short, the only provisions of the contract pro-

1. Puerto Rico has a direct action statute, 26 L.P.R.A. § 2003, under which an insurer is directly liable on the policy to a victim of an insured's negligence.

vided by both parties are the provisions setting forth the minimum amount of information necessary to establish that the insurance applies to this particular insured.

The provision on the first page labeled "Purposes" reads, in relevant part, as follows, the italicized words being typewritten:

"Item 7. Purposes. This policy applies only while the aircraft is (are) used for the purposes classified as *Pleasure and Business and Special Uses.*

(a) the term 'Pleasure and Business' is defined as personal, pleasure, family and business uses excluding any use of the aircraft for which a charge is made; * * *

(f) the term 'Special Uses' is defined as *rental of the aircraft to Miguel Valle d/b/a Inter Island Air Service for Passenger Carrying for Hire.*"

Appellees claim that this clause means that Inter-Island is covered for its negligence when using the plane under the rental agreement with Pennock. They read the passage as saying that the policy "applies" to Inter-Island when it is using the plane just as fully as it "applies" to Pennock when he is using it.

American offers a counter interpretation. It says that the "Purposes" provision merely makes clear that Pennock's coverage for his negligence as a lessor out of control is not forfeited by Inter-Island's use. American draws comfort from a printed "Definition of Insured" —sometimes referred to as the ominibus clause—on another page which first includes "any person or organization legally responsible for the use [of the aircraft]", provided such use is with the named insured's permission, and then states that the insurance

"does not apply:

(a) to any person or organization * * * engaged in the manufacture of aircraft, aircraft engines or aircraft accessories, or operating an aircraft repair shop, airport, hangar, air-craft sales agency, commercial flying service or flying school * * *."

American relies on the reference to "commercial flying service" in the quoted clause which specifies exceptions to the blanket inclusion of organizations operating with the permission of the named insured.

These are most, not all, of the relevant "policy facts". Before we can consider any external "intent facts", we must, absent exceptional circumstances, satisfy ourselves that there is ambiguity. 3 Corbin on Contracts § 579 (1960). Before we make that effort, we deem it desirable to set forth the standard by which we test for ambiguity. That standard is influenced by the fact that the insurance policy in this case is, like many, a contract of adhesion.

In such contracts, the consensual element is sharply circumscribed. The insured is virtually without bargaining power and is generally faced with a take-it-or-leave-it purchase situation. One party, the insurer, drafts the terms of the insurance contract on standard forms. As a result, many of the provisions of the contract are one-sided; the purchaser of insurance agrees only to the price, the monetary limits of the coverage, and to the general risks covered. The remainder is unilaterally set by the insurer. Slawson, Standard Form Contracts and Democratic Control of Lawmaking Power, 84 Harv.L.Rev. 529, 533 (1971). In most instances, the insured receives the complete policy only after he has purchased the insurance. Often he cannot reasonably be expected to understand detailed provisions written by lawyers with an eye to judicial precedent even if he attempted to read the entire policy. Slawson, *supra* at 540; 3 Corbin on Contracts § 559, at 265–66 (1960).

■ Recognizing the unfairness that can result from this situation, Slawson, *supra* at 530–31, courts attempt to resolve insurance disputes with a view to accomplishing the purpose of the insurance. 1 Couch on Insurance § 15:26

(1959). Policies are liberally interpreted in favor of the insured or the beneficiaries. *See generally* Keeton, Insurance Law Rights at Variance with Policy Provisions, 83 Harv.L.Rev. 961, 963–65 (1970). They are carefully scrutinized for ambiguities that require interpretation. 3 Corbin § 579 (1964 pocket part, at 213–14). When any ambiguities are found, courts apply rules of interpretation designed to protect the insured party. 1 Couch on Insurance § 15:26 (1959). For example, courts will adopt the interpretation less favorable to the insurer, the party who supplied the printed form, 3 Corbin § 554, and will give more weight to provisions inserted by the parties than to printed provisions, 3 Corbin § 548.[2] Sometimes courts, straining to achieve a just result, will find ambiguity where none technically exists or will ignore that threshold requirement and look immediately to the facts and circumstances surrounding the making of the contract. Keeton, *supra* at 969–73. Not infrequently the linkage between results and rational analysis has been blurred to the point of invisibility.

Giving weight to the generalized prescriptions flowing from the nature of contracts of adhesion, and also recognizing the need for some limitation on a court's interpretive discretion, we adopt the standard that an insurance contract is ambiguous, even if a careful, expert reading of the entire document might resolve that ambiguity, so long as there exists some internal documentary support for the insured's interpretation which a reasonable person, unacquainted with the niceties of insurance, might similarly interpret. Gaunt v. John Hancock Mut. Life Ins. Co., 160 F.2d 599, 601–602 (2d Cir.) (Hand, J.), cert. denied, 331 U.S. 849, 67 S.Ct. 1736, 91 L. Ed. 1858 (1947); *cf.* Lachs v. Fidelity

& Cas. Co., 306 N.Y. 357, 118 N.E.2d 555 (1954); Keeton, *supra* at 966–74.

Although it is arguable that an expert might adopt American's interpretation and find this contract unambiguous, appellees' interpretation of the contract has reasonable documentary support in the "Special Uses" clause. In addition to the wording of the clause itself, there are several other reasons why appellees could reasonably interpret a clause providing that the policy applies when Inter-Island flies the plane as covering Inter-Island's negligence. First, the form supplied by American was so structured that it would have been difficult if not impossible to indicate that the policy was intended to cover Inter-Island's negligence except by supplying the "special uses" data. The form contemplates only one named insured—perhaps for convenience in fixing responsibility for payment of premiums. It would have been awkward to adapt the policy to reflect two names of insureds. Nor was there any easy way to modify the "Definition of Insured" section so as to prevent Inter-Island from being excluded as a "commercial flying service".[3] There was no place in the policy document other than that available for "special uses" to indicate in any other way that Inter-Island's negligence was covered. Having supplied this form on which it would prove so difficult to express the intended coverage appellees claim, American cannot draw much support from the rigidities of the policy in preventing appellees from laying stress on the few provisions where specific intent could be expressed.

A second factor supporting appellees' interpretation is one other typewritten clause on the first page. Entitled "Pilots", it prescribes as a "condition" that the aircraft be operated only by Pennock "holding an FAA Private Pilot Certifi-

---

2. These rules of interpretation have also been adopted in Puerto Rico. *See* 26 L.P.R.A. § 1125; Barreas v. Santana, 87 P.R.R. 215, 218 (1963); Maryland Cas. Co. v. San Juan Racing Assoc., Inc., 83 P.R.R. 538, 544–45 (1967).

3. The words "commercial flying service" could have been marked through, but then any commercial flying service, not just Inter-Island, would have been covered.

cate" or "any pilot holding an FAA Commercial Pilot Certificate who has flown a minimum of 750 hours as Pilot in Command." Under American's interpretation of the policy, there is no reasonable explanation for this condition. Since Pennock had only a private certificate, it would be a strained construction to say that the clause merely meant that, when he entrusted the plane to another pilot for his—Pennock's—business purposes, a more advanced certificate was required. It is more reasonable to assume that the higher standard must be met by pilots flying for Inter-Island. But if the policy does not cover Inter-Island's negligence, the qualifications of its pilots would be of no concern to American. The fact that such advanced qualifications were required indicates that more was intended by the typewritten "special uses" clause than American contends.

A final reason in support of appellees' interpretation can be found by viewing in context the "Definition of Insured" omnibus clause, which American says excepts Inter-Island from coverage. That provision clearly contemplates excluding the insurer from liability for the negligence of enterprises such as repair shops, airports, hangars, etc., which might have temporary custody of or access to the aircraft and indulge in occasional use for short periods of time. The "special purposes" clause, however, contemplates a regularized and sustained relationship with Inter-Island, something quite different from the fortuitous and unforeseen occasions guarded against by the "omnibus clause".[4]

We find that the appellees' interpretation of the "special uses" provision is a reasonable layman's interpretation and that the policy is therefore ambiguous.

To resolve this ambiguity, we consider the intentions of the parties to the insurance contract as revealed by the facts and circumstances surrounding the making of the contract. Union Ins. Soc. of Canton, Ltd. v. William Gluckin & Co., 353 F.2d 946 (2d Cir. 1965); Great West Casualty Co. v. Truck Insurance Exchange, 358 F.2d 883 (10th Cir. 1966).

After the plane was sold by Inter-Island to Pennock, Valle and Pennock conferred with the insurance underwriter who had written the policy on all of Inter-Island's planes. It was agreed that Pennock's plane would be removed from the Inter-Island policy, that Inter-Island would receive a refund, that Pennock would take out his own policy, and that the new policy would cover Inter-Island when it used the plane. Inter-Island had agreed to inspect and maintain the aircraft; Pennock was to pay for any new parts. The annual premium on Pennock's new policy was $428; Inter-Island's refund on its old policy was $382. The same underwriter wrote Pennock's policy. There was only the faintest chance that Pennock—a lessor out of possession, not having control, and not being responsible for maintenance or inspection of the plane—would ever be liable for an accident while Inter-Island was flying the plane.

It is therefore clear beyond doubt that the intention of Inter-Island, of Pennock, and of their common underwriter was (1) to maintain the pre-existing coverage for Inter-Island, (2) to add coverage for Pennock, and (3) to make Pennock the owner of the policy. We, therefore, affirm the ruling of the district court in denying American's motion for summary judgment.

4. This highlighting of a particular "special use" by an individual running a flying service presents quite a different situation from that found in automobile insurance policies where unforeseen and casual loaning of the insured's car to friends is contemplated. Even in cases involving automobile insurance, courts have liberally construed omnibus clauses in order to effectuate the public policy of broadening insurance coverage. *E. g.*, National Farmers Union Property and Cas. Co. v. State Farm Mut. Auto Ins. Co., 277 F.Supp. 542, 543 (D.Mont. 1967).

## II. CAPACITY OF ADMINISTRATRICES TO SUE.

The wives of both of the deceased passengers filed complaints in their status as administratrices on behalf of their respective estates. In their complaint, they alleged that they were entitled under Puerto Rican law to recover damges for each beneficiary of the estate. American specifically denied this allegation in its answer, but it did not raise again the issue of the administratrices' capacity to sue until after the plaintiffs rested at trial, a year later. Then when plaintiff Wallace sought to amend the pleadings to conform with the evidence by including as beneficiaries of the estate two of the decedent's children by an earlier marriage, American raised the issue of the administratrices' capacity to sue.

 F.R.Civ.P. 17(b) states that the capacity of a representative to sue is determined by the law of the state in which the district court is held. Although Rule 17(a) provides that an executor may sue on behalf of the estate, that provision does not apply in local jurisdictions that have contrary laws. 3A J. Moore, Federal Practice ¶ 17.03, at 101–102 (1970). Normally, Puerto Rico requires heirs to sue or be sued individually. E. g., Heirs of Belaval v. Acosta, 64 P.R.R. 104 (1944). We do not believe, however, that the Puerto Rican rule requires a reversal in this case. The amended complaint was filed by the administratrices one year before the trial when American first argued the issue of capacity to sue. A hearing on various motions for summary judgment had been held several months before trial, but American made no mention of this particular issue. It is true that American's answer denied the administratrices' capacity to sue, but F.R.Civ.P. 9(a) requires not only that a defendant

make a specific negative averment if he challenges a plaintiff's authority to sue in a representative capacity, but also that the averment include "such supporting particulars as are peculiarly within the pleader's knowledge". American merely denied each and every averment in the relevant paragraph of the amended complaint; no mention was made of the reason for the denial.

We assume that the requirement of supporting particulars is to be read with the requirements of F.R.Civ.P. 17(a) which provides that there shall be no dismissal of a complaint on the ground that it is not prosecuted in the name of the real party in interest until after a reasonable time has been allowed for substitution of the proper party. Read together, these two rules require a defendant to do more than this defendant did by way of raising an objection to representative capacity. American should have made clear its objections to the capacity of the administratrices as soon as possible. The correct parties could have then been promptly substituted, and the case would have proceeded without interruption. By holding back until the eleventh hour, American could only be hoping to gain a victory by sowing confusion.

The improper pleading did not prejudice American in any way; from the outset, American knew who were the real parties in interest and what their claims were. Under the circumstances, we hold that American waived the defense of capacity to sue.[5] Cf. Greene v. Goodyear, 112 F.Supp. 27 (M.D.Pa.1953); Peter Pan Fabrics, Inc. v. Acadia Co., 173 F. Supp. 292 (S.D.N.Y.1959), aff'd 274 F. 2d 487 (2d Cir. 1960). We further hold that the court below was correct in permitting the Wallace administratrix to amend the pleadings under F.R.Civ.P. 15(b) to conform with the evidence by

---

5. An alternative ruling would be to reverse but give the proper parties time to be substituted for the administratrices under F.R.Civ.P. 17(a). Since that rule provides that the substantial parties are to be treated as though they were parties at the time of the original complaint, this result would have no effect on the ultimate outcome of the case. Its effect would only be to delay the inevitable, and we find no further delay is warranted.

**1042**

adding the individual claims of the decedent's two children by an earlier marriage to the claims of the decedent's other children set forth in the amended complaint. These new claims were fully litigated without objection before amendment was sought. American was not prejudiced.

### III. ATTORNEYS' FEES.

 The district court concluded at the end of the trial that American had been obstinate in the prosecution of this case and granted appellees' motion for attorneys' fees, pursuant to 32 L.P. R.A. § 1461(6) and P.R.R.Civ.P. 44.4(e). American protests that it has raised substantial legal and factual issues and could not therefore be said to be obstinate. A determination of obstinacy must necessarily rest heavily on the discretion of the trial court. Factors such as the sincerity with which a party puts forth an issue cannot be judged from a cold record. Here the court made a detailed finding of obstinacy. Excluded from its reasoning was the basic legal question concerning the interpretation of the insurance policy, a question of substance, as our opinion indicates. But the fact that a defense is non-frivolous does not insulate all of a party's litigious maneuvers from a finding of obstinacy. Here, as the court pointed out, American appealed an interlocutory decree, dismissed by us as "patently frivolous", renewed its efforts to gain the same result by moving for certificates under Rule 54(b), F.R.Civ.P., and under 28 U.S.C. § 1292(b), and delayed in making motions to dismiss and in raising affirmative defenses. The court did not award full fees, but only an amount it judged equivalent to the degree of obstinacy and the nature of the issues involved. The fees did not equal seven per cent of the total verdict.

Although we agree that there were genuine legal and factual issues involved in this litigation, specifically American's liability for Inter-Island's negligence and the amount of actual damages, we find that the district court was within its discretion in finding American's tactics unduly dilatory. Consequently, we affirm the awarding of fees. *Cf.* Pan American World Airways, Inc. v. Ramos, 357 F.2d 341 (1st Cir. 1966).

We cannot agree, however, with appellees' contention that American's appeal to this court was so frivolous as to justify our awarding fees and costs under 32 L.P.R.A. § 1461 and P.R.R.Civ.P. 52.2. American's liability for Inter-Island's negligence, which was the primary issue pressed on appeal, constituted a substantial legal question.

Affirmed.