AMERICAN EMPLOYERS' INSURANCE COMPANY and Bowerman Brothers, Inc., Plaintiffs-Appellants,

v.

MARYLAND CASUALTY COMPANY, Defendant-Appellee.

No. 74–1300.

United States Court of Appeals, First Circuit.

Argued Dec. 3, 1974.

Decided Jan. 15, 1975.

Kenneth R. Neal, Providence, R. I., with whom Peter L. Kennedy, Providence, R. I., was on brief, for appellants.

Raymond A. LaFazia, Providence, R. I., with whom Delphis R. Jones, Providence, R. I., was on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

Plaintiffs American Employers' Insurance Company and Bowerman Brothers, Inc. sought a declaratory judgment against Maryland Casualty Company with respect to the coverage of a liability insurance policy issued to Bowerman by Maryland. The trial court decided that the policy did not cover Bowerman for a claim asserted by the City of Cranston, R. I., in an action brought against Bowerman and others in the state court.

The facts underlying the city's claim are as follows: In March of 1965 the city engaged Vincent Dimitri, a duly licensed architect, to design and prepare plans and specifications for the construction of a new police headquarters building. When Dimitri had completed the plans and specifications, the construction job was let out for bids. All of the bids for this job exceeded the funds appropriated by the city, and Bowerman, a construction firm, was requested to review certain material including the architect's plans and specifications to determine if there were any areas where the cost of construction could be reduced. Roland Mather, an estimator in Bowerman's employ, reviewed the material and suggested certain changes to effect cost savings. Two of his recommendations were to reduce the thickness of the basement floor slab and to substitute mesh for the steel rods that were to be embedded in the concrete slab. The city approved these suggestions and later asked Bowerman to perform a drafting function incorporating into Dimitri's plans some of the changes suggested by Bowerman as well as other unrelated changes. Bids were again solicited, and in November of 1965 the city awarded the contract to A. DiOrio & Co. and construction began. Bowerman played no part whatsoever in the actual construction of the building and was paid only for the services it rendered in drafting the modified plans.

The new headquarters building was completed sometime in 1968, and the parties stipulated that the city first noticed a settling of the basement floor therein on February 19, 1968. Subsequently the city filed suit in the state court on February 28, 1972, seeking damages in the amount of $250,000 against Bowerman and Dimitri as a result of the settling of the basement floor. The complaint alleged that Dimitri was "negligent in designing a slab on ground type of basement floor rather than a structural type of supported floor . . . "; ' "negligent in designing the basement floor in that he failed to design a structural floor"; "negligent in agreeing to and acquiescing in aforesaid changes advised by defendant Bowerman . . ." It further alleged:

21. Defendant Bowerman was negligent in advising changes in Dimitri's original specifications for the basement floor which reduced the thickness of the slab on ground and the amount of reinforcement in the slab.

22. Defendant Bowerman was negligent in failing to advise the use of a supported basement floor rather than a slab on ground basement floor which it knew or should have known could not be supported by the subsoil.

At all relevant times Bowerman was insured under a series of standard liability insurance policies issued by Maryland, each policy covering a one-year period. These policies provided for coverage with a $50,000 maximum limit. In addition to the policies with Maryland, Bowerman had an "umbrella" insurance policy with American Employers' in effect at the time of the occurrence under which American Employers' would pay any amount over and above the coverage afforded to Bowerman under other applicable insurance or, if there was no other insurance, any amount over and above the sum of $25,000. Thus, the elimination of Maryland's coverage would expose Bowerman and American Employers' to an additional $25,000 of liability each.

There is no dispute that damages for the injuries alleged by Cranston fall within the policy's general coverage for property damage liability. The sole issue before us is the applicability of exclusion (k), the standard "business risk" exclusion, which provides:

"This insurance does not apply:

\*　　\*　　\*　　\*　　\*　　\*

"(k) To bodily injury or property damage resulting from the failure of the named insured's products or work completed by or for the named insured to perform the function or serve the purpose intended by the named insured, if such failure is due to a mistake or deficiency in any design, formula, plan, specification, advertising material or printed instructions prepared or developed by any insured; but this exclusion does not apply to bodily injury or property damage resulting from the active malfunctioning of such products or work;

"\*　　\*　　\*

We are not impressed by plaintiffs' argument that the exclusion does not apply because Bowerman's work was intended solely to cut costs, succeeded in doing so and thus did not fail to serve its intended purpose. If this were Cranston's only goal it could have handled the job itself. As Bowerman well knew its professional expertise was sought to cut costs without destroying the building's structural integrity, a purpose it allegedly failed to achieve. Nor are we persuaded of the clause's inapplicability by the testimony of Bowerman's employees that its work for the city involved *no* engineering or design skills. Although Mather's estimation work may

not have required such skills, it is clear from the words of the complaint that "in advising changes in Dimitri's original specifications" to reduce the thickness and reinforcement of the floor and in failing to advise the use of a supported floor, Bowerman helped determine the building's "design, formula, plan [or] specification," as the court below rightly concluded.

█ The applicability of the "active malfunctioning" exception to the business risk exclusion presents a more substantial question. Although this concept is not without difficulty, Henderson, Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know, 50 Neb.L.Rev. 415, 439 (1971); Tarpey, The New Comprehensive Policy: Some of the Changes, 33 Ins.Counsel J. 223, 225–26 (1966), its basic intent is clear. Design errors [1] resulting in mere "passive" failure to discharge an intended function are regarded as the insured's normal business risk and are excluded from coverage, while design errors themselves causing some positive or "active" harm deemed extraordinary in the insured's business are covered. Thus, to recite some of the hypotheticals appearing in commentaries dealing with the clause, the policy is not intended to cover liability resulting from the faulty design of an insecticide which fails to kill insects, a hair tonic which fails to prevent baldness, or a rust inhibitor which fails to inhibit rust. On the other hand, the active malfunctioning exception would apply to provide coverage for liability resulting from an insecticide which harms crops to which it is applied, a hair tonic which causes a scalp rash, or a rust inhibitor which corrodes a radiator to which it is added. [2] Plaintiffs

1. Maryland argues that the active malfunctioning concept never comprehends design error, but the materials it cites clearly negate this assertion. *See* W. Obrist, The New Comprehensive General Liability Insurance Policy 9 (Defense Research Institute, Inc. monograph, Nov. 1966). The exception's application depends not on the nature of the insured's operation (design vs. production) but on the nature of the resulting harm, as our discussion *infra* shows.

2. *See* Long, The Law of Liability Insurance, App. B, § 13 (1971) (insecticide hypothetical); Gowan, Completed Operations and Products Liability Insurance Coverage of the New Comprehensive General Automobile Policy, 1966 ABA Section of Ins., Negligence & Comp.L. 265, 276 (insecticide hypothetical); Tarpey, *supra* (hair tonic, rust inhibitor hypotheticals); W. Obrist, *supra* (insecticide, hair tonic hypotheticals).

argue, citing language from two cases,[3] that any physical damage to property other than the insured's work product constitutes active malfunctioning. However, the hypotheticals show that there is no active malfunctioning when an insecticide fails to prevent harm to crops from insects even though property other than the insured's work product is physically damaged.

■ Here the harm alleged in the city's complaint—damage to the building and its fixtures resulting from subsidence permitted by the floor's weakness—was precisely the consequence that Bowerman sought to avoid when after "much discussion" it recommended its cheaper floor design. As charged in the city's complaint, Bowerman's recommended design change simply failed to achieve its intended purpose of cutting costs consistent with structural integrity.[4] A finding of active malfunctioning might be justified if the floor as redesigned had included a less expensive concrete substitute which released noxious vapors, making the basement unusable, but the floor's failure to keep the building intact is analogous to the tonic's failure to keep the hair intact.

Our conclusion that there was no active malfunctioning here is buttressed by a statement in Gowan, *supra* at 276, apparently available at the time when the coverage here in question was entered into:

> "Active malfunctioning
>
> \*     \*     \*     \*     \*     \*
>
> "Under this exclusion, the insured gets no protection if he is alleged to have caused the collapse of any structure by having purposely designed or selected a steel beam with insufficient strength."[5]

In determining the intention of the parties to the contract, we think it relevant that such "active malfunction" clauses were commonly used in property damage

---

3. In Haugan v. Home Indemnity Co., 86 S.D. 406, 197 N.W.2d 18 (1972), plaintiff Haugan designed and constructed an airplane hangar and office building which separated from its foundation and became cracked and misshapen. In a declaratory judgment action construing a policy identical to the one issued by Maryland here, the court held that coverage was eliminated by exclusion (m), which provides:

"This insurance does not apply:

.   .   .   .   .

"(m) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith."

The court went on to suggest by way of dictum:

"The same reasoning and the same result applies to the exception relating to 'active malfunctioning' of products or work appearing in exclusion (k). This exception is likewise limited by the basic exclusion (m). It means there is no liability coverage afforded by the policies for damages caused by and confined to the insured's own work or product. However, when the insured's work or product actively malfunctions *and* causes damage to other property coverage is afforded.   .   ." (emphasis added) 86 S.D. at 413, 197 N.W.2d at 22.

In Kyllo v. Northland Chemical Co., 209 N.W.2d 629 (N.D.1973), the court held that exclusion (k) applied to eliminate coverage for damages in the amount of lost profits sought from the insured for the failure of its herbicide to control weeds. The active malfunctioning exception was held inapplicable absent "actual physical damage caused by application of the product." *Id.* at 632.

While these cases support the principle that physical damage to property other than the insured's work product is *necessary* for a finding of active malfunctioning (indeed such a result is required by exclusion (m) anyway), they do not show that such damage is *sufficient*.

4. The purpose of a floor design in such a situation inherently includes avoidance of settling of the floor. Plaintiffs are not helped on this point by arguing that the slab on the floor was defective and that therefore even reinforcing rods and thick concrete (as opposed to the mesh and thinner concrete used according to Bowerman's suggestions) would not have provided the necessary support. This argument concerns a factual issue that must be determined in the main case to establish the causation element of negligence.

5. The word "purposely" here is intended to distinguish the case where a draftsman erroneously alters satisfactory specifications in transcribing them, which would be covered. It does not refer to an intent to have the structure collapse.

policies at the time of the formation of this contract; moreover, plaintiffs do not show that Bowerman thought he was obtaining a general malpractice policy, which is more expensive but which covers errors and omissions, including bad advice. Although we are cognizant of the venerable principle of construing insurance contracts and especially exclusionary clauses strictly against the insurer, the policy in question cannot reasonably be construed to cover Bowerman for this type of risk.

Affirmed.