COMMERCIAL INSURANCE COMPA-
NY OF NEWARK, NEW JERSEY,
Plaintiff-Appellant,

v.

Hector GONZALEZ et al.,
Defendants-Appellees.

No. 74–1132.

United States Court of Appeals,
First Circuit.

Argued Feb. 3, 1975.

Decided March 11, 1975.

John A. Perkins, Boston, Mass., with whom Jeffrey Swope and Palmer & Dodge, Boston, Mass., were on brief, for plaintiff-appellant.

Harvey B. Nachman, San Juan, P. R., and James E. Beasley, Philadelphia, Pa., with whom Beasley Hewson, Casey, Kraft & Colleran, Philadelphia, Pa., Nachman, Feldstein & Gelpi, Antonio M. Bird, Jr., and Bird & Bird, San Juan, P. R., were on brief, for defendants-counterclaimants-appellees, and S. Polanco-Abreu, San Juan, P. R., with whom George L. Weasler, San Juan, P. R., was on brief, for Hector Gonzalez and Conquest Airways, Inc., appellees.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

ALDRICH, Senior Circuit Judge.

On December 6, 1968, a Twin Beech aircraft, carrying ten passengers and a pilot, took off from the St. Thomas, Virgin Islands, airport at 6:19 PM, but failed to clear a hill beyond the runway and crashed in a residential area. Seven persons, including Mars, the pilot, were killed, and twelve were injured. The plane was owned by Conquest Airways, Inc., a Puerto Rico corporation, of which one Gonzalez was president, and was insured for hull and liability by Commercial Insurance Company of Newark, New Jersey. Commercial promptly brought this action in the Puerto Rico district court for a declaration of non-liability. Counterclaims on behalf of Conquest, Gonzalez and all persons killed or injured were duly filed seeking recovery under Puerto Rico's direct action statute. Commercial appeals from judgments based upon a jury determination of liability, four jury verdicts assessing claimants' damages in excess of two million dollars, and court awards of attorneys fees for "obstinacy."

*Liability.*

Simply put, although substantively complex, Commercial disclaimed on the grounds that Mars did not have the experience required to meet the policy's specifications, and because there should have been a co-pilot in any event. Again, speaking broadly, the district court held, *inter alia*, that the provisions of the policy upon which Commercial relied to deny recovery were ambiguous and should be construed by the jury in claimants' favor; *e. g.*, that a "command pilot" was different from a "pilot in command," and that a flight, although exclusively during the night as defined by Federal Aviation Administration (FAA) regulations, was not a "night flight."

*Pilot Qualifications.*

As originally written, the policy covered a single plane, a Dornier, and certain named pilots. There was a provision under which other planes could be added by agreement, by which the Twin Beech was subsequently included. Under an Open Pilot Clause, Endorsement 2, certificated pilots could be added at will, provided they had a certain accumulated experience and Commercial was notified. Mars was hired three days before the accident.[1] To qualify under the Open Pilot Clause he was required to have "logged[2] a minimum flying time of 2,500 hours as *command pilot* [to include not less than] 1000 hours on multi-engine aircraft . . . and 100 hours total time[3] during the last 12 months." (Emphasis suppl.) Mars had not logged the requisite hours if "command pilot"

1. The notification form was required to be filed within 15 days. Mars had made one out, and it was filed within the time. Neither party takes anything from the fact that it was not filed before the accident. We mention this point only to reject a suggestion that Mars had 15 "free" days even if his qualifications were deficient. We take the issue to be simply whether, in fact, he met the qualifications.

2. We agree with claimants that "logged" does not necessarily mean recorded in some log, but merely that it had occurred.

3. Again, we agree with claimants that "total time" includes time not in command.

means "pilot in command," a term defined in the FAA regulations as applying, in the case of a multi-engine plane, only to the first pilot.[4] However, although at first blush the terms might look the same, we agree with claimants that "command pilot" may have a broader meaning by virtue of the regulations. 14 C.F.R. § 61.39(c) provides with respect to a pilot's qualifying for a certificate,

> "(c) *Pilot in command time.* A private or commercial pilot may log as pilot in command only the flight time during which he is the only manipulator of the controls of an aircraft for which he is rated or the flight time during which he is the only occupant of the aircraft."

If under this section a pilot in command cannot count as command time the hours he surrenders the controls to the second pilot, there would seem at least a permissible inference that the second pilot is, pro tanto, accumulating his own "command time," even though not as "pilot in command." This inference may be thought reinforced by section 61.39(d).[5]

Commercial could have contradicted any unfavorable inference by using the regulations' word of art, pilot in command. We may agree that the 2d-pilot's "command time" is not the full equivalent of pilot in command, since he does not have full responsibility for the

aircraft. However, when parties contract with reference to an industry whose terms are defined by an active supervising agency like the FAA, it is to be assumed in the absence of evidence to the contrary, that they have that terminology in mind. *Cf.* Superior Business Assistance Corp. v. United States, 10 Cir., 1972, 461 F.2d 1036, 1039; Arc & Gas Welder Associates, Inc. v. Green Fuel Economizer Co., 4 Cir., 1960, 285 F.2d 863, 868, cert. denied, 366 U.S. 919, 81 S.Ct. 1095, 6 L.Ed.2d 241; Petro v. Ohio Cas. Ins. Co., S.D.Cal., 1950, 95 F.Supp. 59, 62. When Commercial failed to use the regulation-defined phrase, the jury was warranted in finding it intended not what otherwise might be thought an ellipsis, but a lesser meaning; particularly so if the regulation itself suggested that lesser meaning.

We observe, further, that the notification form supplied by Commercial for pilots claiming to qualify under the Open Pilot Clause did nothing to lessen this inference, and if anything, reinforced it. Instead of providing space for listing "pilot in command" hours, it supplied three columns, headed "1st Pilot," "Co-Pilot" and "Total."[6] If "command time" in the Open Pilot Clause meant only pilot in command time, the form could easily have been more specific. Failing this, we cannot say the jury was required to interpret the policy as Commercial contends.[7] Gonzalez testified

---

4. " 'Pilot in command' means pilot responsible for the operation and safety of an aircraft during flight time." 14 C.F.R. § 1.1.

5. "(d) *Second in command time.* A private or commercial pilot may log as second in command that flight time during which he is performing the duties of a second in command. He may be credited with not more than 50 percent of that kind of flight time toward the total flight time required for a higher certificate or rating."

6. The statement in Commercial's reply brief, "The pilot information form expressly uses the terms 'Pilot in Command' and 'Co-Pilot' in contradistinction to each other," perhaps the keystone to its argument that there is no ambiguity, is simply not so. Quite apart from section 61.39(c)'s indication that all hours spent as 1st pilot do not count as pilot in

command time, to call for a combined total is not to emphasize distinctions.

7. We remark that this does not mean what the court on several occasions charged the jury, "Whenever you find that an ambiguity does exist, you must resolve all questions in favor of the insured." In light of the court's apparent misunderstanding of our decision in Marston v. American Employers Ins. Co., 1 Cir., 1971, 439 F.2d 1035, we note that grounds, including appropriate extrinsic evidence, may be found to show that the unfavorable interpretation was the one reasonably understood by both parties. *See Marston,* ante, at 1040. That the court misunderstood this is apparent, not only from its charge, but from the fact that in awarding counsel fees for "obstinacy" one of its reasons, (relating to night flight, post), was that the company sought to persuade the jury that the circumstances warrant-

that he gave Mars the form, telling him it was to record his "command time." *Inter alia,* Mars wrote 3400 hours as Co-Pilot of multi-engine planes, and opposite it, as "Total," 1700 hours. Although the question may be close, and was made perhaps closer by other evidence suggesting that the 3400 hours figure itself was a considerable exaggeration, we cannot say that the jury could not conclude that Mars had satisfied the Open Pilot Clause's requirements.

■ Next, Commercial points to a provision in the Open Pilot Clause which required pilots to be checked out "in type by Dornier Factory or Professional Pilot Checkout Organization." Gonzalez explained that this was because the Dornier plane had some peculiarities, and that he subsequently asked that this restriction be lifted. Quite possibly in response to this, Endorsement 7, under which the Twin Beech was added, incorporated "Endorsements 1, 2 (without requisite to be checked out by Dornier Factory)." Commercial claims it was still necessary to be checked out by a professional pilot organization. However, it was meaningless simply to omit checking by Dornier Factory as a "requisite." Checking by Dornier never was a requisite; there was always the alternative. We cannot quite say, when Commercial used this phrase in the endorsement following Gonzalez' request, that it was not open to the jury to find that it meant to remove the entire checkout requirement, so that the fact that no organizational checkout was made is of no consequence.[8]

### The Absence of a Co-Pilot.

■ We mention briefly Commercial's disclaimer based on the presence of a tenth passenger seat, a violation of a recent FAA regulation unless there were two pilots, which, concededly, there were

not. Mars had been instructed by Conquest's chief pilot to remove the tenth passenger seat, but he did not do so. The policy provided that it did not apply,

"(4) while [the aircraft is] being operated under circumstances requiring a special permit or waiver from the Civil Aeronautics Authority (even though granted)."

If violation of this regulation fell within this exclusion clause, that is the end of the case. Arnold v. Globe Indem. Co., 6 Cir., 1969, 416 F.2d 119, 122; Underwriters at Lloyd's of London v. Cordova Airlines, Inc., 9 Cir., 1960, 283 F.2d 659, 665; Bruce v. Lumbermen's Mut. Cas. Co., 4 Cir., 1955, 222 F.2d 642, 645. Exclusion clauses, however, are to be strictly construed. We agree with the court in Roach v. Churchman, 8 Cir., 1970, 431 F.2d 849, that if every violation of a regulation exempted the insurer, it is likely that almost any accident would be excluded, and that such an interpretation is to be avoided if reasonably possible. It may be that a fair meaning of this clause would be to confine it to those FAA regulations in which there are express provisions for waiver or amendment. *Cf.* Cordova Airlines, Inc., ante. We need not decide this point, however, because of Conquest's breach of the two-pilot requirement contained in the policy itself.

### Night Flight.

■ In the negotiations for the policy Gonzalez was told that the company would require two pilots for night flights. The policy, when issued, provided in Endorsement 1,

"Warranted co-pilot to be carried on all instrument flight rules or night flights."

The court charged the jury, without exception by defendants, that this provision "in which the insured warrants that

---

ed a particular interpretation in its favor, which we read not as weighing the sufficiency of its reasons, but simply as penalizing the company for trying at all. It is only when an ambiguity finally remains that it is to be construed against the company.

8. This conclusion is not only a close one, but attributes substantial carelessness to the preparer of Endorsement 7, a fact perhaps worth noting when another aspect of Endorsement 7 is considered, post.

a co-pilot will be carried on night flights is valid and binding upon the insured, provided it is not ambiguous, and [if] there is a breach of warranty there is no coverage and no recovery permitted under the policy." This was correct. Coffey v. Indiana Lumberman's Mut. Ins. Co., 6 Cir., 1967, 372 F.2d 646, 648; Fidelity-Phenix Fire Ins. Co. v. Pilot Freight Carriers, Inc., 4 Cir., 1952, 193 F.2d 812, 815–16, 817–18; Henjes v. Aetna Ins. Co., 2 Cir., 1943, 132 F.2d 715, 718–19, cert. denied, 319 U.S. 760, 63 S.Ct. 1316, 87 L.Ed. 1711. Claimants defend on the ground that the warranty was in fact ambiguous in respect to the term night flight.

The FAA regulations define night as follows:

"'Night' means the time between the end of evening civil twilight and the beginning of morning civil twilight, as published in the American Air Almanac, converted to local time." 14 C.F.R. § 1.1, *Definitions.*

It was stipulated that on the day in question the sun set at 5:37, civil twilight ended at 6:07, and the plane took off at 6:19, or 12 minutes after FAA night had commenced. In this posture claimants note that neither the policy nor the regulations define night flight. They then point to section 61.47(b), which reads as follows:

"(b) *Night experience.* No person may act as pilot in command of an aircraft carrying passengers during the period beginning 1 hour after sunset and ending 1 hour before sunrise (as published in the American Air Almanac) unless, within the preceding 90 days, he has made at least five take-offs and five landings to a full stop during that period of the day."

This regulation was made much of during the trial, and was presented to the jury by claimants as "defining night flying." [9] This involves so many errors that it is difficult to know where to begin. In the first place, quite apart from the seeming illogic of night meaning one period of time, and a night flight another, 14 C.F.R. § 1.1, contains, alphabetically, over one hundred definitions, and following night gives no separate definition for night flying or night flight. If, for any reason, a different one was intended, this would have been the place for it. We do not accept claimants' criticism of Commercial as seeking to "engraft" the definition of night "into the term night flight." The manifest purpose of the word night is to refer to activities that occur at a certain time. Secondly, as the court charged the jury, n. 9, ante, section 61.47(b) did not even purport to be a definition; it is apparent that the section is simply a "refresher" provision, not a definition of night flight. The selection of a high degree of darkness, see n. 10, post, to achieve the maximum benefit from this review exercise, and the failure to make the requirement applicable to a lesser degree of darkness, is not to be read as creating an ambiguity contradicting the regulation's explicit definition of "night," or its application to regulations specially directed thereto.

Finally, claimants' contention proves too much. The regulations contain many provisions relating to night flights, and if because of this special section the word night, when modifying flight, does not mean what it is otherwise defined as meaning, the entire scheme of the regulations would be upset. It cannot be that because of section 61.47(b) this particular flight though obliged to carry "night" equipment, section 135.153, and subject to a regulation for "night" takeoff, section 135.87, was not subject to "*Visual flight rules (night).* For VFR flight at night," section 91.33(c). These pari materia provisions were brought into the policy by virtue of Exclusion (d), which provided that the policy did not cover operation "in violation of any air navigation regulations or instructions applying to . . night flying." To say under such circumstances that because one dictionary meaning of night is darkness, and some

---

9. Singularly, the court, although it read the provision in full, then charged the jury, without exception, "This is not a definition, but a safety operating rule."

of the witnesses said there was still light,[10] the regulations for night flying applied, but it was not a night flight with respect to the two-pilot requirement, would be to abuse beyond recognition the rule that insurance policies are to be construed against the company. As we said with relation to "command time," persons engaged in the aviation industry must be presumed to contract with relation to the accepted industry terminology to which they are subject unless there is something affirmative to the contrary. Here there was nothing.[11] The absence of a second pilot was a material breach of the policy.

*The Policy.*

Commercial attached to its complaint a copy of what it alleged to be the insurance policy, including six allonges entitled Endorsements 1, 2, 3, 4, 5 and 7, *viz.*, with no endorsement number 6. The endorsements added benefits, for an extra premium, *e. g.*, 4 and 7, or imposed restrictions, *e. g.*, 5. Although there was no endorsement numbered 6 attached, Endorsement 7, the one which added the Twin Beech plane to the coverage, contained the following provision.

"It is further understood and agreed that:

(1) Such insurance as is provided hereunder with respect to the above described aircraft applies subject to the same purposes of use, geographical limits and pilot warranties as expressed in Items 7, 8 and 9 of the 'Declarations,' as completed/extended by Endorsements 1, 2 (without requisite to be checked out by Dornier factory) and 6 of this policy;"

As against this implication that there was an Endorsement 6 which Commercial had failed to reproduce, when Gonzalez was deposed a few months after suit and exhibited the original policy it, too, had no such endorsement.[12] After introducing the policy at the trial Gonzalez first said that he could not say whether it was complete, because the pages were "separated." He was reminded that they were in that condition when he produced them at the deposition, and had said they were complete. The separated pages as introduced at the trial, and numbered and initialed by notary at the deposition, clearly showed there was no endorsement 6.

Later during the trial, although conceding that Gonzalez and counsel for Commercial had stated that this was the whole policy, counsel for claimants demanded of Commercial that it produce Endorsement 6. A sidebar conference took place, during which the court stated, "If you inform the Court there is no endorsement 6 that's all right." Commerical's counsel repeated that claimants' counsel had been told that there never had been such an endorsement. After some further argument between the attorneys, counsel for the insured interjected, "So far as Conquest Airways, I

---

**10.** There are, of course, degrees of darkness, *viz.*, end of civil twilight, nautical twilight, and astronomical twilight. *See* Webster's Third New International Dictionary. Darkness also varies from day to day, depending on weather conditions; scarcely a test for the operation of a commercial airline.

**11.** As a final effort, claimants attempt to make an inocente out of Gonzalez. On his own testimony, however, he had had a pilot's license, requiring knowledge of the regulations, since 1958, and a commercial pilot's license since 1962, with 3400 hours of logged time in 1968 when he applied for the policy. In addition, he had had experience with aircraft insurance. No amount of tempering the wind to "a reasonable person, unacquainted with the niceties of insurance," *see Marston*, n. 7, *ante*, 439 F.2d at 1039, could permit him to claim that

he did not understand the word "night" when used in connection with flying. We somewhat regret the brevity of our quoted expression in *Marston*, because of the court's apparent misunderstanding and overextension. Naturally, we meant a reasonable person in the position of the insured. A businessman or a professional entering into a contract is expected to have the usual sophistication and understanding of those in the industry to which the contract relates. Porto Rico Sugar Co. v. Lorenzo, 1912, 222 U.S. 481, 32 S.Ct. 133, 56 L.Ed. 277.

**12.** Parenthetically, it will be recalled that if we had not previously assumed the preparer of Endorsement 7 to be careless, the case would have ended then and there. *See* n. 8, *ante*.

would like the Judge to instruct the jury that the fact that there is no endorsement 6 does not help either of the parties or hurt them." The court closed the bench conference by saying it would hear all parties when instructions were discussed.

If the court's remark was not a positive statement that Commercial need do nothing further, it was at least reasonably capable of being so understood and it was apparent that Commercial's counsel so took it. Nevertheless, when the court came to charge the jury it said,

"The insurance company at no time introduced Endorsement Number 6 to the policy, nor did it offer any evidence to show that Endorsement 6 was not available to them.

"I instruct you that under the law of Puerto Rico, you must presume that the provisions of Endorsement # 6 to the policy contain material unfavorable to the insurance company's case."

Quite apart from the improper direction "must" rather than "may," this charge would seem to permit a finding than an endorsement 6 had eliminated any condition the jury chose, without the need of analysis or further consideration. However, before reaching the question of new trial, our first consideration is whether the absence of an endorsement 6 deprived Commercial of its right to a directed verdict because of the breach of the night flight provision.

The court nowhere suggested what "material unfavorable to the insurance company" the jury could find was contained in the absent endorsement, and, as we noted ante, charged the jury in positive terms that the night flight provision in Endorsement 1 was binding on the insured. Nor did claimants' counsel, in their summation, make any reference to the absence of an endorsement. We will, however, consider the question in the light most favorable to claimants, namely their present suggestion that although Endorsement 7 incorporated En-

dorsement 1, the absent endorsement may have removed the night flight two pilot requirement therefrom. We note at the outset, however, that there can be no rational suggestion that it removed it simply for the Twin Beech. Not only did Gonzalez receive Endorsement 7 unaccompanied by Endorsement 6, but Endorsement 7, as has already been noted, contained a special modification of Endorsement 1 with respect to the Twin Beech and would presumably have contained any other if any other had been intended. The issue, therefore, is whether it could be inferred that the company issued a general revocation of the two pilot requirement, without cost, because Gonzalez never paid for it or by accepting agreed to pay for it, and which, because of some mistake, Gonzalez never received.

 It is elementary that if a party has evidence, here, allegedly, a document, in its control and fails to produce it, an inference may be warranted that the document would have been unfavorable. However, there are two conditions. Not only must it appear that the evidence is available, and specially available, *cf.* Kean v. Commissioner of Internal Revenue, 9 Cir., 1972, 469 F.2d 1183, 1187–88; United States v. Johnson, 1 Cir., 1972, 467 F.2d 804, 808, cert. denied, 410 U.S. 909, 93 S.Ct. 963, 35 L.Ed.2d 270 to the non-producing party, but it must appear that that party had some reason to suppose that non-production would justify the inference. This not only means a "factual area in which [the inference] can logically operate," *see* Wilson v. United States, 8 Cir., 1965, 352 F.2d 889, 892, cert. denied, 383 U.S. 944, 86 S.Ct. 1199, 16 L.Ed.2d 207; Jenkins v. Bierschenk, 8 Cir., 1964, 333 F.2d 421, 425, but, what is determinative here, the totality of the circumstances must bring home to the non-producing party notice that the inference may be drawn. Here, not only was the insured the party possessing the policy,[13] but it disclaimed

---

13. The statement in claimants' brief that the company was the "custodians (sic) of the original policy" is, of course, erroneous. An insur-

ance company keeps records, but the policy is customarily delivered to the insured, and was in this case.

knowledge of an endorsement number 6, which was in itself substantial evidence that it did not exist, thereby undercutting the court's patently erroneous charge affirmatively accepting existence and stating that Commercial had done nothing to show it was not available. But of more importance, the record had been left, in light of the court's statement that counsel's representation made it "all right," that Commercial's counsel had been led to believe that there was no burden on him to do anything further.

In view of this, Commercial's position was little different from the defendant in Case v. New York Central R.R., 2 Cir., 1964, 329 F.2d 936. There the defendant introduced hearsay testimony that its absent employee witnesses had said they could contribute nothing. The court said, "That finishes that." The court of appeals held that in these circumstances no inferences were to be drawn from their non-production, and that if the plaintiff had been dissatisfied he should have taken steps. So here claimants, with, as they themselves point out, seven days left before the end of trial, could have served a subpoena duces tecum. However, although knowing of the court's statement and its effect on counsel, they did nothing. This was not to be excused by any theory that the burden of proof was on Commercial because it had brought the suit; Commercial had satisfied its burden.

▮ More important substantively, even if inferences were permitted to be drawn we would be hard put to think that a jury could be allowed to speculate that the company, unbeknownst to Gonzalez, had issued a free waiver of the requirement that there be two pilots on night flights. Gonzalez testified that before purchasing the policy he shopped around for the lowest cost, a matter of

significance when the insured is seeking a broad interpretation of the policy. *Cf.* American Employers' Ins. Co. v. Maryland Cas. Co., 1 Cir., 1975, 509 F.2d 128. That a low premium company, which insisted from the outset on two pilots for night flights, should thereafter, without charge, issue an endorsement renouncing that substantial safeguard, is hard to conceive. As the court said in Jenkins v. Bierschenk, ante, 333 F.2d at 425, "The supposition must rise above the level of mere possibility." Moreover, there was an opposing inference. Endorsement 5 had been a restriction. If one could suppose that there was in fact an endorsement 6 which the company, in preparing the copy of the policy, had overlooked, it could have been one that Gonzalez, in studying the policy preparatory to defending the suit, found detrimental. His separating the pages, and his failure to produce an endorsement 6, could be due to the fortunate discovery from examining the pleadings that the company had overlooked it, so that its disappearance would pass unnoticed. As was held in Felice v. Long Island R.R. Co., 2 Cir., 1970, 426 F.2d 192, 195, cert. denied, 400 U.S. 820, 91 S.Ct. 37, 27 L.Ed.2d 47, if the court instructs that an inference may be drawn against one party, it must point out, where appropriate, that there is an opposing inference that the jury must consider as well.[14]

▮ In sum, to infer on this record that there had been a waiver of the requirement that there be two pilots on night flights would seem the rankest speculation. We need not, however, decide this question. Since an inference that the policy was other than as identified by the insured and introduced in evidence was precluded in any event, not only was the charge erroneous but, on the agreed evidence as to the time of takeoff and absence of a second pilot, a

---

14. We do not mean by this to charge Gonzalez with dishonesty. He and the company were in accord as to the content of the policy. We merely say that if claimants under these circumstances choose to make charges of concealment, it is not a one-way street. We may add, what perhaps should have prefaced the Policy portion of this opinion, that we have grave reservations whether, in the absence of proof of collusion, a direct action statute can permit a claimant, who stands in the shoes of the insured, to assert that the policy differs from what the insured and the insurer agree were its terms.

verdict of non-liability should have been directed.

The judgments against Commercial are vacated and the case remanded with directions to enter judgments in its favor on the complaint and on the counter-claims.[15]

---

15. We have not hitherto mentioned that Gonzalez and Conquest filed counterclaims for injury to their business caused by Commercial's

denying liability under the policy. These, too, must fail.